The Assistant Vice-Chancellor.
The decree of the court of session in Scotland, entered in 1814, has a very important, and in one aspect, a controlling influence in this cause ; and before observing upon either of the other questions, which, very interesting as they were in themselves, were rendered peculiarly so by the ability of the argument on both sides; I will examine the effect of that decree upon the rights of the children of George Douglas, Junior, in the heritable estate of Sir William Douglas.
The bill sets forth the process of multiple-poinding and exoneration, the proceedings thereon, and the decree. It alleges that Mrs. Monroe was then an infant of tender years, residing in the city of New York, where her guardians also resided; that no process was served, and no notice given, either to her or her guardians ; that the proceedings in Scotland were hurried through, between the 7th of October, 1813, when they were commenced, and the 24th of February, 1814, during a period of active war between Great Britain and the United States, and while no intercourse was kept up, and no communication had, between Scotland and the United States; that Mrs. Monroe as an *179 infant, was incapable of employing, and neither she nor her guardians did employ, Mr, Young, who, by the record of the process, is represented as having appeared for her; nor did she nor they, employ any other person. The bill also states her ignorance of the proceedings till long afterwards; and avers that the decree reserved the rights of the children of George Douglas, Jr., as between themselves.
The answer insists that the proceedings in the multiple-poind' ing, were regular according to the Scottish law, and decided the rights of these parties as between themselves; that the decree is still in full force, valid and binding on the parties thereto ; and the subject matter thereof having been adjudicated upon by the courts of Scotland, such adjudication cannot be inquired into in this court, or elsewhere, except in the court where it was rendered, and in the manner provided by the laws of Scotland; and the defendant sets up the decree, as a complete bar to this suit.
At the hearing, the complainants counsel contended that the decree of the court of session was null and void, having no force whatever, because Mrs. Monroe was never domiciled in Scotland, she was not served with any process in the suit in which the decree was made, and the appearance that was entered in her behalf, was wholly without authority; and because no decree could be made against her, an infant, until a tutor or curator ad litem had been appointed to represent her in the suit.
The general principles applicable to this subject, are well settled and established in countries where the common law prevails. Where the matter in controversy is land, or other immovable property, a judgment pronounced in the forum rei sitae, is held to be of universal obligation, as to all the matters of right and title, which it professes to decide in relation thereto, and absolutely conclusive. And in whatever place the proceeds of the same property may afterwards be found, such judgment acting in rem, will be held equally conclusive, by whomsoever the title may be questioned, and whether it be directly or incidentally brought in controversy. (Story’s Conflict of Laws, § 591 to 593, and 549 note; 3 Burge’s Commentaries on Colonial and Foreign Law, 1015, 1062, 3, 1066.)
*180 This is founded on the principle, applicable to judgments in rem, against every species of property, as well as to many of those in personam, that it is the province of every sovereignty to administer justice in all places within its own territory, and under its own jurisdiction ; to take cognisance of crimes committed there, and of the controversies that arise within it. Other nations ought to respect this right; and as the administration of justice necessarily requires, that. every definitive sentence, regularly pronounced, be esteemed just, and executed as such ; when once a cause in which foreigners are interested, has been decided in form, the sovereign of the defendants ought not to listen to their complaints; for to undertake to examine the justice of a definitive sentence, is an attack upon the jurisdiction of the sovereign who passed the sentence. (Vattel’sLaw of Nations, B. 2, Ch. 7, £ 84.)
This applies to proceedings in rem, as to movable property, situated within the jurisdiction of the tribunal in which they are instituted; as for example, proceedings in the admiralty courts, and those under the foreign attachment laws of the several states ; which are sustained, in rem, when questioned in another state or country. (Bradstreet v. Neptune Insurance Company, 3 Sumner, 605 ; Starbuck v. Murray, 5 Wend. 148, 159 ; Story’s Confl. of Laws, § 549.)
The principle is laid down in respect of foreign judgments in general, that to give them validity in other countries, the court pronouncing them must have had a lawful jurisdiction over the subject matter. And when this is applied to judgments which are purely in personam; it imports actual jurisdiction of the parties, by domicil, or by service of process or voluntary appearance. The case of Borden v. Fitch, 15 Johns. 121, 142, was of this character. The court in Vermont had no jurisdiction of the subject matter, or of the defendant, and the decree was held to be void. The distinction was there recognized between such a proceeding and one in rem. The same observations apply to Bissell v. Briggs, 9 Mass. 462, 468. See also Bates v. Delavan, 3 Paige, 299, 305.
So it is said, that where there was no jurisdiction, the foreign *181 judgment is void, whether it were in rem, or in personam, or against both; and the proper inquiry is, had the forum jurisdiction of the subject, and has it complied with the local law, so as to acquire it; because if the judgment were void there, it is void every where.
There has been much conflict in the decisions of the courts in the different states, as well as in England, as to the force of a foreign judgment, in personam, when brought directly in question in another country; especially when it is made the foundation of a suit or proceeding. When it is produced in defence, as exceptio rei judicatce, it has usually been received as binding. In the former case, many enlightened judges have held that foreign judgments should have the same weight as those of their domestic tribunals; while others would give them merely the force of presumptive evidence. The jurists, in countries where the civil law prevails, have exhibited much less of international comity in this respect, than has been observed by the courts in England and the United States.
But in reference to judgments and decrees in rem, there is no conflict of law in civilized countries. The adjudications in this country and in England, are harmonious; and jurists on the continent of Europe, yield their full assent to the principles sustained by the courts where the common law prevails. (Grignon’s Lessee v. Astor, 2 Howard’s R. U. S. Supreme Court, 319, 338, and the cases there cited.)
In determining the force of a foreign judgment, in rem, the court where it is propounded may look into the power under which the foreign tribunal acted, to see that it had jurisdiction of the subject matter. (Per Marshall, Ch. J. in Rose v. Himely, 4 Cranch, 269, 270.)
And Mr. Justice Story, adds, (speaking of proceedings in rem against movables,) it must appear that there have been regular proceedings to found the judgment or decree; and that the parties in interest in rem, have had notice, or an opportunity to appear and defend their interests, before it was pronounced. (Story’s Confl. of L. § 592.)
What the notice shall be, or what opportunity shall be given to appear, in such a case ; is regulated wholly by the local law *182 where the proceeding takes place, as will he presently shown. If that law be pursued, the requirement of notice to the party is fulfilled. The sufficiency of the notice or opportunity, is not open to examination in the court where the foreign judgment in rem, is produced. (See 3 Burge’s Comm. 1054.) A familiar illustration of this, may be seen in our attachments against non-resident debtors, upon which the notice to the parties in interest in the property attached, who may be residing in Calcutta or Canton, is by law published in two or three newspapers in this state. The notice may never reach the parties, and they may in fact have no opportunity to defend; but the proceeding is conclusive in rem, here and every where.
The foreign court must have jurisdiction of the subject matter ; and how is this conferred, assuming that the court has general jurisdiction in the country where the property is situated ?
Here it is to be borne in mind, that the effect of a judgment in rem, is wholly distinct from its effect against the person of the defendant. It may be entirely conclusive as to the former, and yet be inefficacious for any purpose, in personam, either in a foreign tribunal, or in the country where it is recovered. Thus, in the every day’s occurrence, of the foreclosure of mortgages in this court, against a mortgagor who is personally liable for the debt, and by reason of his absence from the state, is not served with process. The decree is made on the publication of notice; and in respect of the mortgaged premises, is binding and conclusive. So far, it is in rem. But if in the same decree, the mortgagee should insert a clause that the mortgagor must pay the deficiency of the debt, if any there should be, after a sale, and awarding execution against him therefor ; such clause would be purely, in personam, and of no avail or force, even in the court where the decree was entered.
In order to acquire jurisdiction of the subject matter, in rem, it is not necessary that the court shall bring the parties within reach of its process.
Where the subject matter of the suit, the Res, is within the territorial dominion of the sovereign power under the authority of which the court acts, it is within the jurisdiction of such *183 court. The presence or the domicil of the parties proceeded against, has no importance in such case, in determining the question of jurisdiction. They would on the other hand, be all important if the proceeding were purely in personam.
Mr. Burge says, jurisdiction is founded, either in respect of the defendant’s domicil in the territory of the tribunal, ratione domicilii; or in respect of his being possessed of some estate or subject within it, ratione rei sitae; or on arrestment of his movables there, (3 Comm. on Col. and For. Laws, 1016, 1017.) And this jurisdiction, ratione rei sitae, is fully recognized and applied in the law of Scotland. (Erskine’s Institute, B. 1, T. 2, § 17, 18. Ferrie v. Woodward, 9 Cases in Court of Session, by Shaw, &c. 854.)
Having jurisdiction of the subject matter, in rem, the local regulations and laws of the country in which the court proceeds, as I have already remarked, must determine what service of process, or what form of notice, shall suffice, to give to the defenders an opportunity of being heard in their defence.
Chief Justice Marshall says, in his admirable judgment in the case of Rose v. Himeley, (4 Cranch, 241, 268, &c.) “ of its own jurisdiction, so far as depends on municipal rules, the court of the foreign nation must judge, and its decision must be respected.” And Mr. Burge, after observing that the vocatio in jus, the citation of the defender, is essential; well says, that when the tribunal acquires jurisdiction, ratione rei sitae, this citation is necessarily a mere formal act. And he subsequently adds, that personal citation in such case is not necessary. (3 Comm. on Col. and For. Laws, 1018, 1056, 7. See also Bradstreet v. Neptune Insurance Company, 3 Sumner, 606 to 609, per Story, J.)
Therefore when a foreign judgment or decree, in rem, comes in question here; the inquiry is not, was the defender therein served with process, or did he appear in the suit, as it would be if the foreign proceeding had been to establish a personal demand against him; but the question is, did Has forum rei sitae proceed according to its own municipal laws, in pronouncing such judgment or decree.
In effect, we should treat the judgment of a foreign court, *184 acting in rem, within its appropriate power and jurisdiction, with the same respect, and concede to it the same consequence, that we would to similar judgments of the courts of our sister states. We should allow the party contesting its validity, to show that it was procured by fraud, or that it is void on its face, or void by the local law, fori rei judicatae. But such party cannot he permitted to show that he never had any notice of the suit, otherwise than by showing that the notice prescribed by the local law was not given ; thereby proving the judgment to be void by that law. Actual notice, in suits in rem, is not required to be given to absentees, in any system of municipal law with which I am acquainted.
Nor can the party be allowed to show that there are errors of law on the face of the judgment; for that would compel our courts to sit in review on the adjudications of the foreign tribunal. When the foreign judgment produced in evidence, appears to be regular in form, and to contain the essential parts of an adjudication of the controversy made between proper parties; the. burthen of showing its invalidity rests upon the party who desires to impeach it. This principle applies also to foreign judgments in personam, where the latitude of impeachment is much more extensive than it is in the instance of judgments, in rem.(a)
The application of these observations to the case before me, is free from difficulty. The record produced shows a case of multiple-poinding and exoneration, in the court of session of Scotland, in which the trustees under Sir William Douglas’s trust disposition and settlement or testament, interpleaded, (to recur to our own law terms,) all the other parties interested in, his estate; in order to have their rights ascertained, their conflicting claims settled, and the way paved for the safe discharge of the trustees from their trust. The summons, issued October, *185 7th, 1813, sets forth the trust disposition, and the various claims, among which is the identical question now raised, upon the construction of the same instrument; and the four younger children of George Douglas, Jr. are therein described as residing in New York. The return of the messenger at arms follows, showing that he had twice summoned with many formalities, as being forth of Scotland, the four younger children, (naming them,) and their tutors and curators, if any they had, at the market cross of Edinburgh and the pier and the shore of Leith. A second return is made, showing a personal service on the now defendant George Douglas, upon the 10th December, 1813. His claim as heir, to the heritable estate, and a claim of the four others to the whole movable property, are then entered. An interlocutory decree, dated January 19, 1814, appears to have preceded these claims in point of time, by which the court held the proceeding to have been properly instituted, and directed the defenders to produce their claims within ten days. On the 12th of February, 1814, the cause was called, and the Lord Ordinary again directed the claims to be produced, and the parties procurators to debate- thereon at the next calling. On the 24th February, 1814, the Lord Ordinary made his de- ' cree, which recites that he had heard the parties procurators. And this decree appears to have been signed by him on the 1st of March, 1814.
It is not denied that the proceeding appears to have been regular in point of form. And the respect which is due to the judgment of the court, requires that we should presume all that appears in the record preliminary to that act, to have been rightfully and properly done, according to the local laws and regulations of the country. It is therefore to be taken, that the court of session may by the law of Scotland proceed in rem, against persons resident out of that realm; and that the established form of notice to such persons, is that pursued with the summons in this instance. There being no effort to prove the contrary, no proof in support of the record was necessary. I will refer as illustrating the point, to 1 Bell’s Comm, on the Laws of Scotland, 496, where edictal citation is said to be, where the party cited, though amenable to the courts of Scotland, is out of *186 that country, and it is made by proclamation at the market cross of Edinburgh and the pier and shore of Leith. This form was abolished, and a more reasonable notice for absentees provided in its stead, by the act 6 Geo. 4, ch. 120.
In the edictal citation, the defender though under age, was to be cited on the summons as a party to the suit, and his tutors and curators were also to be made parties; not by their names, because the pursuer might have no means of knowing who or where they are, or where they can be found. And such citations were used, where the minor had no tutors or curators. (Erskine’s Institute, B. 4, Tit, 1, $ 8.)
Bringing this record to the test of the principles previously advanced, there can be no possible doubt of the jurisdiction of the court of session over the subject matter of the decree in question. The property involved, was immovable property, land, situate in Scotland. The questions of title arose under a deed of trust or “ disposition and settlement,” made in pursuance of the laws of that country and peculiar to those laws, by a native of the country who was domiciled there at the time of his death. The trustees were residents of Scotland, the one temporarily, and the other permanently. The whole subject was emphatically Scotch, and more appropriate to the tribunals of Scotland, than it could be to those of any other country.
The jurisdiction of the parties, wherever they were, was incident to the locum rei sitae; and on pursuing the prescribed forms of summons, service and proclamation, the right of the court to proceed and decide upon all the questions involved in the heritable estate, was perfect and complete.
Whether the subsequent proceeding was perfect or was void, is a distinct proposition. I am now showing that the circumstance of the four younger children being residents of a far distant country, and utterly ignorant of the suit in point of fact, in no degree militates against the regularity of the proceeding, the jurisdiction of the court, or the conclusive effect of the decree. Much stress was laid upon that circumstance, together with the tender years of the parties, the relations then existing between our nation and Great Britain, and the entire suspension *187 of intercourse between the two countries, flagrante bello. These facts would go far to excite sympathy, were it shown that injustice ensued; but neither hardship nor sympathy ought to bend great principles of law. It does not appear that the laws of Scotland provide any different summons or proclamation for an absentee who is an infant, or on the oppositeside of the globe, or in a country at war with Great Britain and by her fleets embargoed from any intercourse with other nations ; from those which must be pursued to summon an adult living on the southern bank of the Tweed. Those laws exclusively, control the mode of procedure in their own courts, and we have no right to judge of their wisdom or propriety.
The multiple-poinding being strictly a suit in rem, the subject matter in Scotland, and the foreign parties interested, summoned according to her laws ; I have no doubt that the court of session had ample jurisdiction over the estate and the parties, to decern as was done in this decree.
Analogous cases in our own courts, are not uncommon. A bill is filed in the court of chancery in this city, for the construction of a will devising lands situate here. Several of the defendants, who, upon one construction which is set up, have an estate in the lands, reside in Scotland. An order is made requiring them to appear, which is advertised in a newspaper published in this city, and another published in Albany. The Scotch parties hear nothing of the suit or the notice, and after an interval of six months, the bill is taken as confessed for default of their appearance, and the court proceeds to a hearing of the cause, decides on the construction of the will and the rights of the parties, non-resident as well as resident, without hearing any argument in behalf of the former, and perhaps decrees that by the will properly construed, they took no estate or interest in the lands. We are familiar with such cases ; and it would appear exceedingly strange to us, if a party in whose favor such a decree had passed, having sold the lands, and removed to Scotland, should there be sued in the court of session, by some of the defendants who had been advertised in the suit here as non-residents, and the claim seriously made, that the decree here was of no force beyond this state, that the con *188 struction of the will was still open as to those parties, and that the court of session was bound to decide upon it as res integra. Yet it would be precisely like this case, with the single exception of the question arising upon the infancy of the two youngest children. A rule of law, which in either country would permit such a disregard of the judgments of the legal tribunals in the other, would be intolerable, in this era of unexampled social and commercial intercourse between the people of this country and those of Great Britain.
It appearing that the court of session had jurisdiction of the cause, the parties, and the subject matter ; what effect is to be given to its decree ?
The same undoubtedly, to which it is entitled in the courts of Scotland. (Smith v. Lewis, 3 Johns. R. 168, 9, per Kent, J.; 3 Burge’s Comm. 1062, 3, and 1066, 7; Coitington’s case, 2 Swanst. 326 to 330, note.) If valid there, it cannot be investigated here. If it were such a nullity by the laws there, that it would be unavailing when set up as res judicata, or as a defence ; it would be equally inoperative here.
It is not proved what force a judgment in rem, against an absent defendant who is not personally notified, has according to the law of Scotland. In the absence of proof, it must be taken to have some force and efficacy; for this court has no right to presume that the Scottish courts go through the idle form of making decrees which are of no force at all by their own law. The least that can be presumed on the subject from general principles, is, that such a judgment is valid and binding on the parties, until it is opened, vacated, or set aside.
In a Louisiana case which was cited, (Psyche v. Paradol, 6 Louis. R. 366, 376, 7,) where the matter came up before the same court, a petition had been filed; and then without any process, notice, or publication, on the plaintiff’s application, a curator ad hoc was appointed to represent the infant defendant. The court held it of no force, the judge putting it on the ground among others, that there was neither party, citation, nor contestatio litis, in the case. The respect due to a foreign judgment, recovered in Scotland, was carried far beyond anything claimed in behalf of this decree, in Douglas v. Forrest, (4 Bing. 686, *189 702.) And see a similar case, Becquet v. McCarthy, (2 B. & Ad. 951.)
The law of Scotland, being matter of proof in the cause, I cannot act in my decision, upon the information which I may have obtained in regard to that law from other sources. But I have in this, and some other instances, resorted to such Scottish law books as were accessible, and appeared to be works of authority, in order to satisfy myself whether any further testimony of that law, would elucidate the case, or present it in a different aspect.
Professor Erskine gives to decrees in absence, full effect and validity, until the defender appears and challenges the same. (Erskine’s Institute of the Law of Scotland, B. 4, Tit. 3, § 6. And see Grant v. Pedie, 1 Wils. & Shaw’s Appeal Cases, 720, per Lord Eldon ; and Brown v. Sinclair, 2 Shaw & McLean, 140, per Lord Brougham.)
Before referring to the mode of challenge which is permitted, it should be mentioned, that it is not merely judgments or sentences against non-residents and persons never personally cited, which constitute decrees in absence. Where the defender is personally cited, but chooses not to appear, the only decree which the pursuer can obtain on his default, is a decree in absence. And such decrees may, in general, be opened up and the merits contested by the defender, whether he were a minor or an adult, within forty years after they are pronounced.
Hence, if it be proper in any country, that decrees presumptively valid, should be reviewed and set aside, in the court which pronounced them ; it is emphatically just and proper, in respect of decrees in absence obtained in Scotland. The process or action there resorted to for this purpose, is called “ Reduction and it is defined as “ a rescissory action peculiar to the court of session, whereby deeds, decrees, &c., may be rendered void.” (2 Bell’s Law Dictionary, 389 ; Ersk. Inst. B. 4, tit. 1, § 24, and tit. 3, § 8.)
Mr. Burge says, “ Suspension and reduction, are the remedies by which the law of Scotland relieves parties from the effect of such decrees of the court of session as are given to their preju *190 dice, or which can be again brought under their own review on account of any substantial defect.” (3 Burge’s Comm. 1024.)
Several illustrations of the mode and limit of enforcing this remedy, will be noticed in another place. I will refer also, to' the citations in Brown v. Sinclair, (2 Shaw & McLean’s Appeal Cases, 121, 123, 124, 140, et seq.)
It should be observed, that where a judicial sale is founded on a decree in absence, on opening it up and reducing it, the sale is unaffected. The defender’s remedy is against the parties who have received the benefit of the sale. (2 Bell’s Com. 279.)
Besides the principle that a decree in absence in rem, can only be reduced in the court where it was rendered; the defendant may repose himself in this case, upon the important distinction between an action brought to enforce a foreign judgment, and the plea of a foreign judgment opposed to a suit instituted for the purpose of destroying its effect, or of establishing a right inconsistent with that conferred by it. In the latter case, the exceptio rei judicatae, the party asks merely that the court will not interpose, because the sentence can be reviewed only by appeal. (3 Burge’s Comm. 1058, 9.)
This distinction, well known in the law of Scotland, (Ersk. Inst. B. 4, tit. 3, § 4;) is also recognized and established in the common law. (Philips v. Hunter, 2 H. Blackstone, 402, 410, 414; Smith v. Lewis, 3 Johns, 168, 9 ; 2 Kent's Comm. 120, 2d ed.) Where the foreign judgment was in rem, the occasion for urging its validity must necessarily be by way of defence, almost invariably ; thus falling within the strong position of the exceptio rei judicatae.
So in this instance, the defendant asks no aid or interposition from the courts of this state. He insists, that the complainants remedy (if any they have) against the decree in question, regarded as a decree in absence, is confined to a suit or application for its revision and correction in the court of session in Scotland ; to an action of reduction of the decree.
This is not only conformable to the law applicable to such judgments, but in my opinion, it is peculiarly appropriate to a foreign decree like this, involving the construction of a will *191 executed in the country where it was pronounced, and governed by the laws of that country.
A distinct objection to the validity of the decree, is presented on the ground that the record shows an appearance to have been entered in the suit in behalf of Mrs. Monroe, when, in fact, there was no authority from her or her guardians for any person to appear or to represent her in the proceedings.
As to this, no appearance at all being requisite, it would seem that the decree can be no less valid for the reason that the defenders, who were forth of Scotland, appeared and were represented by eminent counsel. I speak now of the point, irrespective of the question of Mrs. Monroe’s minority. A decree, (aside from that question,) would have been valid, without any appearance, and an unauthorized appearance would make it no worse.
It may be said, however, that the counsel who appeared, conceded away her rights. It is true, her claim appears to yield the point as to the heritable estate; but the record shows, that the judgment of the court was actually exercised on the question. Whether there was a prior claim asserting her right to the heritable estate, and after debate thereon and the decision of the judge, a new claim in her behalf was then exhibited conformable thereto, and the latter inserted in the record, as was ingeniously suggested by the defendant’s counsel; or whether the advocate, acting on his best judgment of the law or of the interest of his client, preferred her claim in the form now appearing in the record; it is impossible for me to say upon the testimony, or from any information I can obtain respecting the practice of the court of session. The summons or process of multiple-poinding, stated correctly the conflicting claims of the children of George Douglas Jr. to the heritable estate; and these alone appear to have been the foundation of the suit. It seems from Mr. Young’s account rendered to Mr. Hannay, that there was an actual calling and debate of the cause, and an actual judgment of the Lord Ordinary, Gillies, on the question. And • the same account shows that the claim was revised and altered according to the suggestions of the counsel, the charge for which *192 is entered as if it had occurred after the entry of Lord Gillies’ decision. .
But waiving the point on the importance of the appearance; is it proved that there was no authority for Mr. Young to represent Mrs. Monroe as mandatory, or for Mr. Wood to act as her advocate, on the construction of the disposition and settlement? Whether their appearance was in the proper form, is a question entirely distinct from this.
In the first place, where the record states that the party appeared by attorney, (or by the proper officer for that purpose,) the authority of the attorney will be presumed. (Shumway v. Stillman, 6 Wend. 447; Harrod v. Barretto, 1 Hall’s Rep. 155 ; Voorhees v. Bank of the United States, 10 Peters, 449 ; Tipton v. Mayfield’s Curator, 10 Louis. R. 189.)
(It seems that in Scotland, where counsel are entered as being present, the court will not treat a decree as made in absence, or otherwise than in foro. Kerr, petitioner, 4 Deas & Anderson 185.)
The importance of this rule, is obvious from the practice in our own courts. Our records seldom show the authority under which solicitors and attorneys appear to prosecute and defend suits. Probably in this case, the mandatory appeared in the mode accustomed in the court of session, and there as well as here, the court has no record of his authority, other than the record of his official capacity as a writer to the signet, or as an attorney or solicitor. If after the lapse of thirty years, one relying on a decree of this court, should be called upon to prove that the solicitors who appeared in the suit, were authorized so to do by their clients ; not one decree in a hundred could stand under the ordeal.
In this instance, the rule acquires additional force and importance, from the circumstances under which it is invoked. The suit occurred in a distant foreign tribunal. The actors in it are all dead. The bill was not filed till twenty-eight years after the decree was made, and no intermediate step has been taken to open, vacate or set aside the decree; although its existence and. effect were known to Mrs. Monroe’s guardians within a year or two after its entry, and must have been known to her when she *193 became of age and competent to act for herself, about eight years after such entry.
Not only is the burthen of disproving the authority, upon the complainants, but very clear and stringent proof to that effect, is indispensable, to overcome the presumption of authority arising from the record itself, fortified as it is by such circumstances. (See Bradstreet v. Neptune Insurance Company, 3 Sumner, 604, per Story, J.)
The testimony introduced to disprove Mr. Young’s authority, consists of Mr. Cruger’s fruitless search for a power or letter of attorney ; his testimony and that of Mr. Anderson, as to various declarations and writings of Mr. Young and others; and the correspondence between Mrs. Margaret Douglas, the mother and one of the guardians of Mrs. Monroe, and Samuel Douglas, one of the trustees in the Disposition and Settlement.
Of the declarations and writings proved by Messrs. Cruger &. Anderson, they are not legitimate testimony, beyond the accounts made out by Mr. Young ; and the latter are consistent with an authority either to Mr. Hannay or Samuel Douglas.
The search was made in the Register’s office in Edinburgh, where powers of attorney respecting lands are recorded; and Mr. Cruger also inquired for the power, of Mr. Young’s partners, he being absent at the time. Judging from analogy to our usages, and its intrinsic propriety, such a letter of attorney, being purely ad litem, would be found either among the attorney’s papers, or on the files of the court of session. No search was made among those files, nor among the papers of Samuel Douglas or Mr. Hannay, and the search in Mr. Young’s papers, was not so thorough, by reason of his absence, as to be safely relied on. Then in regard to the correspondence. It is not certain, that all of it is produced. The letters which are in evidence, certainly raise a strong inference against the idea that any authority was transmitted from this country, to appear in the suit, or in any suit, respecting the inheritance.
On the other hand, the correspondence shows that the question between the defendant and his brother and sisters, was distinctly exhibited to Mrs. Douglas in 1810 and 1811. The opinion of three eminent lawyers on the point, was transmitted *194 to her. The necessity of a suit in Scotland, to determine the question, was made known to her, and the opinion declared the necessity of her childrens being represented, and of suitable powers of attorney being sent for that purpose. All this was before the war broke off the direct intercourse between the two countries. It also appears, that Hr. Young, who did appear in the suit, was a writer to the signet, of high character and respectability ; the standing of the advocates who appeared and advised for Mrs. Monroe, is sufficiently shown by the fact, that two of them subsequent^ became judges of the court; and two of them were signers of the opinion given in February, 1810, which pointed out the necessity of the power of attorney. All of them are also shown to have been gentlemen of eminence in their profession, and one, Lord Jeffery, is well known both as a man of letters and a judge, on this side of the Atlantic.
Connecting with these considerations, the great lapse of time during which the decree was fully known, they appear to me to be quite sufficient to repel the inference derived from the letters and the other testimony to which 1 have alluded; and the presumption of authority arising from the record itself, remains in full force.
If it be said that the infancy of some of the parties, precludes the inference of any power of attorney or proper authority; I can only answer that the law of Scotland on that subject is not proved. I suppose it is not unlike the common law in that respect ; but I am not judicially informed. An officer of the court appeared in the suit, and there is no proof that the guardians of absent infants could not give him sufficient authority ; or that the court does not appoint a mandatory on an edictai citation.
I must consider the objection founded upon the alleged want of authority to appear for the infant defendant, as detracting nothing from the force of the decree of the court of session made in 1814.
There is still another, and a very serious objection brought against that decree, independent of the absence of the parties, and the alleged unauthorized appearance; and which, it is insisted, rendered the decree absolutely void against Mrs. Mon *195 roe in Scotland, and a fortiori, in every other country. She was an infant, and the record of the decree shows that she was represented in the suit by a mandatory ; and it does not show that she had any tutor or curator ad lites, which the Scottish law required.
One answer to this objection is, that the alleged rule of law is as much a fact to bn averred and proved, as the manner of the appearance itself; and there is no averment of the kind in the bill, and no issue to which the evidence in support of the objection is pertinent.
The bill is silent on this point, and it reposes its claim to avoid the decree, upon the entire want of authority for the appearance made in behalf of Mrs. Monroe in the suit. But I will, for the present, pass by this answer to the objection.
By the record of the decree, it appears that Mrs. Monroe put in her claim in the suit, by Alexander Young, writer to the signet, her mandatory; and the claim appears to have been signed by “ A. Wood.” Mr. Wood, it seems, was an advocate, (or counsellor at law, as it would be termed in this state;) and Mrs. Monroe was at that time between twelve and thirteen years of age.
To prove the law of Scotland on the subject, the complainants examined as witnesses, two writers to the signet in Edinburgh, Messrs. John and Francis Anderson. The interrogatory put to the witnesses was this: “Is any authority necessary to bind minors in legal proceedings? If yea, what authority, and from whom must it come ?” Their answer was: “ The question is one of law, and more adapted for the opinion of counsel. As it has been put, however, he saith that he considers the concurrence of a guardian or curator necessary to bind a minor in legal proceedings.”
The cross interrogatory called on the witnesses to point out their authority by law books, specifying the pages particularly. In their answer to this, the witnesses refer to a passage from Erskine’s Institute, which they quote at large from book 1st, title 7 th, and section 13. The quotation is as follows: “Minor is either pursuer or defender; in any action, he must have a curator to support him in his prosecution or defence, under whose *196 authority the suit may be managed "on his part; for sententia contra minorem indefensum lata nulla est; whether, therefore, the minor be engaged in a law suit with his curators, or having no curators; with a stranger, a curator ad lites must be given him by the judge, even though the nomination should be demanded from him, not by the minor himself, but by the adverse party ; for every litigant has an interest that the proceedings in any cause in which he hath a concern, be regular. And if such curator be not demanded by either party, the judge ought to appoint one ex officio.”
This is all the proof on the subject. I confess it does not relieve the complainants’ case, even with the aid of the treatise cited.
To render a foreign judgment void, on the ground that it is contrary to the law of the country where it was given, the proof that it is so, must be clear and unequivocal. (Becquet v. MacCarthy, 2 Barn. & Ad. 951; Voorhees v. Bank of the United States, 10 Peters, 449.)
According to our law, an infant cannot appear in a suit by attorney or solicitor. If he prosecute a suit, it must be by his next friend; if he defend one, he must be represented by a guardian ad litem. Nothing is more clearly settled and understood ; and doubtless most of our attorneys and solicitors, and many of our counsellors, if examined as witnesses on the subject, would testify, that a judgment or decree entered against an infant, who appeared by his attorney or solicitor, instead of his guardian ad litem, was void ; or in the language quoted from Erskine, '■'■nulla est.” Their meaning would be, and such is our law, that such a judgment or decree is erroneous, and the infant may reverse or avoid it. It is of no avail against him, if he choose to set it aside. Not that it is absolutely void, or a mere nullity. On the contrary, until reversed or set aside by the infant, in a proceeding directly upon the judgment or decree, it is valid and effectual. No person except the infant, can even allege its invalidity ; and he can attack it only in the court where it was recovered, or on an appeal or writ of error, reviewing it in a higher court. He can never question it collaterally, and after he has been of full age two years, he can neither reverse it nor move to *197 set it aside. See an authority for this, in a case arising under a law of Maryland, in the supreme court of the United States, Thompson v. Tolmie, 2 Peters, 157, 163.
In this instance, the modest answer of the two Edinburgh solicitors, aside from Erskine, does not lead to any conclusion that by the law of Scotland, a decree taken against an infant, appearing by a mandatory instead of a curator, is absolutely void. The quotation says, a judgment against an infant undefended, nulla est, literally, is nothing. So one of our solicitors, if he quoted Blackstone’s Commentaries, might say, “ an infant can neither alien his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract that will bind him.” And a French lawyer, relying upon such a quotation, would obtain a very mistaken view of our law, as to the acts and disabilities of infants.
Again, in respect of Erskine, the maxim does not apply literally to an infant defended by a mandatory; it is the decree against an infant not defended at all, which nulla est. The great defect in the evidence is, that it does not inform the court, what effect or consequence the law of Scotland attaches to the faulty or irregular appearance of an infant in legal proceedings. This very case, for example, might have been presented to the witnesses, and their testimony taken upon the point. A proper inquiry would have been, “when the court of session proceeds by edictal citation, against a minor residing in a foreign country, is it necessary that any appearance be made for the minor, before a decree in absence can be entered against such infant?” If the answer declared that a curator ad litem must first be appointed, another inquiry would be, “ if, after a proper citation, a decree should pass against a minor on an appearance by a mandatory, or without any appearance at all, would it be as valid as decrees in absence against adults, or would it be voidable for that cause also, or would it be absolutely void, and of no force whatever ?”
As the testimony stands, I am wholly unable to decide whether this decree was as valid by the mandatory’s appearance, as it would have been by a curator’s: or was voidable, at the in *198 stance of the infant, for the defect in the appearance, or whether it was purely void.
A nullity never can be waived. An irregularity can be. Therefore, any defect which the party can waive, is of the class which makes the proceeding irregular, and not null. Let me suppose, in this case, that the one-third of castle Douglas, had turned out to be worth, in 1815, only as many dollars as it sold for in pounds sterling ; that the Galloway Bank had wound up prosperously, and Mr. Anderson, of Fermoy, had paid his debt in full. And farther, that the defendant, after his right to collate under the decree had lapsed by time, on finding that he was a pecuniary loser by being made sole heir to the heritable, and excluded from the movable estate, had brought a suit against his brother and sisters, claiming his share of the latter property, on the ground that the decree was null and void, by reason of their not having been cited personally, or because they did not appear in the proceeding by a curator ad litem 7 What would have been the answer of the brother and sisters to such a claim 7 Unquestionably, they would have said, “ true, our appearance in the multiple-poinding was irregalar ; it was erroneous, and we could have set it aside, and opened the decree ; or by a reduction of the decree, it might have been vacated. But that was our privilege, and at our election. You had no such right; and we preferred to suffer the decree to stand. It was always binding upon you; it is now binding upon us.”
Thus, in my judgment, the proofs fail to show that by the law of Scotland the decree of 1814 was void as against Mrs. Monroe, because of the appearance in her behalf by the mandatory.
Recurring to the Scottish treatises and adjudications, of which Erskine’s' Institute as to this point, may be regarded as testimony, I find my doubts as to the nullity of the decree entirely removed ; and that it stands on the same footing as to the infants, that a similar judgment does at common law.
But first, it is at least doubtful, so far as I could ascertain with the limited means of information at my command, whether in a proceeding in the court of session, by edictal citation against a minor who is forth of Scotland, it is necessary that there should *199 be, either a tutor, curator or mandatory appointed, for the minor, or any proceeding had analogous to our appearance.
Thus it. was held in Calderhead's Trustees v. Marshall, (10 Shaw, Dunlop & Bell’s Cases, 582; S. C. 5 Deas & Anderson’s Rep. 316, May 26, 1832,) that it was not competent to appoint a tutor ad litem to a minor who had made no appearance in the action. The Lord Ordinary in his opinion, said that “ by the law of Scotland, a pursuer cannot compel a party to appear injudicio, and if a defender is not in court, all that can be done is to take a decree in absence.” The Judge eanhot appoint a curator for an absent defender. If a pupil is brought into court by his natural guardian, then the court, suo motu, or on application of the opposite party, may appoint a curator ad litem. And the consent of the natural guardian is not necessary for such appointment. The counsel who desired the court to appoint a curator in that case, cited the section of Erskine from which the Messrs. Anderson’s quoted in their testimony. The Lord Ordinary referred to the case of Stark v. Sinclair, hereafter cited ; and 1 Bell’s Law Dictionary, 340, 349, to the same effect. From the report in 5 Deas & A. 316, it is inferible that the minor had been personally cited, but had never appeared in court personally, or by his relatives or natural guardian.
So long as a decree in absence is wholly ex parte, and is open to reduction both by adults and infants against whom it is recovered, upon the mere suggestion of its character; to what end or purpose should the court nominate a tutor for a minor defendant ?
But assuming that the practice in Scotland, like that here, requires a proper person to be appointed for" the infant’s protection, before proceeding to a decree against him as an absentee, and that such person is to be a tutor or curator, what is the effects of its omission 1 First however as to the nature of that office. In Scotland, males under 14 and females under 12, are called pupils, and from thence till of full age they are minors ; but these words are often used without discrimination for what we call infants, or all persons under 21 years of age. Macallan .says, when a pupil becomes a pursuer or defender of a process. *200 a tutor ad litem must be appointed : The summons or defence for the pupil, must first be in court. (Practical Digest of the Law of Scotland, 6. And see 2 Bell’s Law Dict. 230, 232, 375 and ibid, title “ Curatory.”) For minors not under pupillage, a curator ad litem, is appointed for the same ends. Mrs. Monroe in 1813, 14, was a minor, and her proper representative ad litem, would have been a curator.
Mr. Bell says, that the law of Scotland requires that a curator for the minor should be made a party to judicial proceedings in which he is interested. Where the minor already has curators, they are to be cited with him. Where he has no tutors or curators, tutors and curators must be cited edictally, and when appearance is made for the minor, a curator ad litem must be appointed for him; and if this be omitted, any decree in foro against him will be reducible on that ground. The appointment is made on motion of either party, by the judge before whom the process depends. (1 Bell’s Law Dict. 340, 349, title, Curatory.)
I may add, that the guardians appointed in New York, had no authority or control over the immovable estate of the infants in Scotland. (2 Kaims’ Eq. B. 3, ch. 8, § 1.) So far as they may be deemed curators, they were edictally summoned in the first process,
A curator ad litem should have been nominated, before further proceeding. Instead of which a Writer to the Signet, as her mandatory, appeared for the minor, in the suit. A mandatory, in the Scottish law, is equivalent to a general agent, in our law, and is not an attorney or solicitor; (Erskine, B. 3, tit. 3, § 31 to 42; 2 Bell’s Law Dict. 208 ;) and in the civil law, where he is employed to institute or conduct a suit, he is designated as a procurator ad lites. (3 Burge’s Comm. 984.) If a curator had been moved for in the suit, a Writer to the Signet would have been appointed. In fact, a W. S. appeared and acted, not as a curator, but as a mandatory or procurator.
Now what was the consequence of this appearance, in form so improper ? If the appearance had been in the correct form, (there being no actual defect of authority shown,) the decree would have been in foro, as it is expressed in Scotland, and not *201 on the footing of a decree in absence. It would therefore have fallen within the “ Quadrennium Utile” of the Scotch law, which is the privilege that minors have of being restored against judicial acts, and which may be exercised within four years after they arrive at majority. But within the four years, they must raise and execute the action of Reduction against such judicial acts. (2 Bell’s Law Dict. 230, 231, 376.) So that if Mr. Young, in this record had been described as curator ad litem, instead of mandatory, Mrs. Monroe’s remedy in Scotland would have been barred in 1826.
As the record actually is, the decree was irregular and erroneous ; and was, (and as a decree in absence I suppose still is,) liable to an action of suspension and reduction in the court of session. But until reduced, it is valid in Scotland, and not subject to be attacked there or elsewhere, collaterally, as is attempted to be done in this suit. Thus, Mr. Bell says in the paragraph already quoted, a decree against a minor, for whom no curator has been appointed, is reducible on that ground.
In Sinclair v. Stark, (6 Cases in the Court of Session, by Shaw & Dunlop, 336; January 15th, 1828,) a decree had been obtained against a pupil, without any appearance having been made for him, or any tutor ad litem, appointed. The summons had been regularly entered against him personally with edictal citation against tutors and curators. It was contended that the decree was null and void ; but after full consideration, the court held, ten judges against four, that the decree was not void, but merely subject to be opened up as a decree in absence. (See also, the case of Dick, May 15, 1828, 6 Shaw & Dunlop, Cases in C. of S., 798.) In 7 ibid. 364, in the case of Dick, Feb. 5, 1829, it was held, that a decree against a pupil undefended, was null, and that he was entitled to be reponed and restored against it, in integrum.
The difference between reponing a decree, and having it recalled or reduced, appears to be, that on reponing, the pursuer in the original process, must show that the decree was well founded ; but when it is not reponed, the defender must show that the decree was ill founded. In both instances, the proeeed *202 ing to effect the object is the same, by a libel or claim founded upon the original suit, and seeking to invalidate its effect.
I have been unable to examine at large, the report of this case of Dick, in 7 Shaw & Dunlop, and being ignorant of its particular circumstances, I cannot judge how far it is inconsistent with the decision in Sinclair v. Stark, the year before. It may have been made by a different judge, in a different division of the court. It certainly appears to hold a doctrine in accordance „ with the complainant’s case; but it is not in that respect, reconcilable with the earlier or the subsequent adjudications.
I find that in the case of Sinclair v. Brown, presently mentioned, the Lord Ordinary in his judgment, in 1834, (see it in the report of the appeal, 2 Shaw & McLean, 109,) stated the case of Sinclair v. Stark, above cited, as being settled law ; and the subsequent decisions in Sinclair v. Brown, both in the First Division, and before all the judges, appear fully to sustain the doctrine of that case.
Deviating a little from the chronological order of the authorities, I will here notice the case of Sinclair v. Brown, which is to be found in the Cases in the Court of Session, 13 Shaw, Dunlop, Bell & Murray, 594, and again in 15 Dunlop, Bell & Murray, 770 ; also, in 2 Shaw & McLean’s Appeal Cases, 103. A decree rescinding a disposition and sasine, and settling a heritable right, was taken in 1786, and followed in 1788 by a decree of reduction-invprobation, in favor of the same parties ; both being taken as decrees in absence, against an undefended pupil. In 1832, after the lapse of more than forty years, in which time there had been various sales of the estates, (but there had also been successive minorities,) the representatives of the pupil raised a reduction of those decrees, and of all the subsequent conveyances. The decrees, and the lapse of time, the sales and the conveyances, with other circumstances, were pleaded in answer to the reduction, and for the purpose of excluding it. The Lord Ordinary, May 13, 1834, held the defence to be valid. The pursuers of the reduction, reclaimed to the Lords of the First Division of the Court of Session, who on the 3d March, 1835, recalled the previous decision, and held, amongst other things, (all the judges concurring,) that the decrees of 1786 and *203 1788, being led in absence against an undefended pupil, it was competent to open them up within the long prescription, and that minority was not to be deducted in computing the prescription. They opened the decree of reduction-improbation (which has peculiar sanctity in Scotland,) because, it was in absence against a pupil, no defences were lodged, no discussion took place, and no further compearance was made: but they add a quere, whether such a decree regularly obtained in absence against a person of full age, is liable to be opened up. From this interlocutor, Brown and others appealed to the House of Lords, and on the 17th July, 1835, that court remitted the case to the court of session, with instructions to have the matters of law argued before all the judges of that court, including the Lords Ordinary; and two questions were presented for their consideration ; the first, on the general effects of decrees in absence, and whether the right to reduce them might be affected by laches, or other circumstances, short of the forty years ; and secondly, whether the disabilities of parties by reason of minority or the like, were to be added to the time allowed for reduction by the forty years prescription. (2 Shaw & McLean, 147 to 153.)
The case was heard accordingly, and a decision made on the 9th of March, 1837, in which all the judges present (eleven in number) concurred, and the interlocutor entered was, that if the minorities should be completely established, the pursuers cannot be held as barred from challenging the decrees of 1786 and 1788, as decrees in absence; and it then remitted the case to the Lord Ordinary to have it proceed. The whole court held, 1. That as the decree affected the title to a heritable estate, minorities were to be deducted in computing the years of prescription against the pursuers ; and 2. That if, after deducting minorities, the long prescription had not run upon the decrees in absence, those decrees did not technically form a title to exclude; yet nevertheless, this did “ not necessarily imply the instant recall of the decrees, or place the defenders in the same situation as if they had never been pronounced.” But that lapse of time, combined with other circumstances, might form a plea of personal exception against the pursuers, or might “ have a *204 most important effect in determining that general question of which the pursuers necessarily undertook to make out the affirmative, viz: whether in the whole circumstances, the decree ought or ought not to be reduced
The effect of this elaborate case, as I understand it, is that a decree in absence against a pupil or minor, for whom there was no tutor or curator appointed, is not null or void ; but is liable to reduction, at the suit of the minor or his representatives, within forty years after its entry, adding to the forty years the periods of minority. And that special circumstances may abridge the period within which reduction may be rightfully claimed, or bar it in a shorter time.
In Roberton v. Roberton, 9 Cases in the Court of Session, by Shaw, Dunlop, Bell, &c., 865; S. C. 4 Deas & Anderson, 244 ; July 2, 1831; a suit had been commenced in 1804, by children, (of whom the plaintiff, who was then a minor, was one,) against their uncle, in action of count and reckoning. The plaintiff had no curator ad lites, in that suit. There was a decree against the uncle, and the plaintiff received his share under it, pursuant to drafts drawn while he was a minor, but which were settled with his agent after he was of full age. After an interval of fifteen years, he brought an action in reduction of the decree, alleging errors, &c., in the accounts. The court of session held that the decree was homologated.
The rule of the Scotch law requiring cur atores ad lites, applies as well to cases where minors are pursuers, as where they are defenders; and in the one last cited, the ground was, that the decree was void as to the minor pursuer in the first action. The court held otherwise, and that his subsequent action founded on the decree, made it conclusive upon him.
The long contested and very intricate case of Maule v. Maule, 4 Deas & Anderson, 252, shows that the omission to have a tutor ad lites, at the most, brings a decree which would otherwise put the minor to his duadrennium Utile, to the level of a decree in absence, and subjects it to the action of reduction within the forty years.
Analogous in principle to these cases, is Craigie v. Scobie, 4 Deas & Anderson, 303. There a decree in absence had been *205 obtained against a married woman, while she was under interdiction, (relative to which see 1 Bell’s Comm. 139 to 141,) without making her interdictar a party. A new suit founded upon that decree, was brought against her, in which she pleaded that the decree was null for that cause. It was decided that the plea of nullity of the decree, could only be competently discussed in a process of reduction.
It may be seen by Mr. Burge’s valuable work, that various nullities, as they are termed by the civil law lawyers, must be taken advantage of by an appeal, or similar direct proceeding,. ■¡and may be cured by lapse of time.
The result of this examination is that the decree is not null and void for the error in the mode of appearance, for the minor in the multiple-poinding; and that her remedy for the defect was by reduction of the decree in the court of session. The case heretofore cited, Voorhees v. The Bank of the United States, 10 Peters, 449, forcibly illustrates the principles of law applicable to the defects, objected against this decree, as well as the competent mode of taking advantage of the same. See also Thompson v. Tolmie, 2 ibid. 157,163 ; and Grignon’s Lessee v. Astor, 2 Howard’s U. S. Rep. 319, 340, &c.
The bill alleged that the decree reserved the rights of the defenders, as between themselves. I think its express terms show the contrary, and that it is a positive decree against the younger children, in favor of George Douglas, as to the entire third of the heritable estates. That such is the appropriate effect of a decree in multiple-poinding, see 2 Bell’s Law Dict. 239, 240 ; Ersk. Inst. B. 4, Tit. 3, § 23.
One ground remains, upon which the decree was assailed at the hearing with much zeal and a powerful display of argument. I allude to the charge of fraud against the defendant, in respect of the decree, and the proceedings which led to it. 1
The only charge in the bill which approaches to an intimation of fraud is, that at the time the proceedings were commenced, and while the same were in progress, and when the decree was pronounced, the defendant was in Scotland, with the understanding that he should look to the interests of his younger *206 brother and sisters, and should keep the family informed of every thing that transpired in relation thereto. And that Mrs. Monroe was then an infant of tender years, residing in the city of New York, where her guardians also resided. The bill avers that they were all wholly ignorant of the suit and proceedings, and in this connection, states that no process was served, and no notice given to her or her guardians.
Without stopping to criticise the meagre aspect of this allegation, as a ground work for so grave an accusation as was made at the hearing; I am perfectly satisfied that no man can read Mrs. Margaret Douglas’s letters to Samuel Douglas, describing the habits and character of the defendant, and cautioning him against consulting her son or depending upon him, either in respect to his own interests or the interests of the rest of her family ; without a perfect conviction that the charge in the bill, relative to his being intrusted with the interests of his brother and sisters, is utterly without foundation.
The multiple-poinding was doubtless the offspring of the trustees desire to settle the question of title, and to purchase the castle estate for the son of James Douglas; and the testimony in the cause has satisfied me that the defendant had no concern with its institution, or with its management in respect of the other parties in the proceeding.
The claim that the defendant was a trustee of the proceeds of the heritable estate for the other children, falls with the charge of fraud.
With a decree of a competent tribunal adjudging the estate to be his, and an uninterrupted claim of the whole as his own, exclusive of any other right, from the time of such decree to this day, there is no room for the doctrine of constructive trusts, as applicable to the property in question.
My conclusion on the points already examined, relieves me from looking into the defendant’s strong ground of the “ homologation” of the decree in question.
In my judgment, the decree itself is a bar to this suit; and the complainants remedy, (if any there be remaining to them at this day,) against the defects alleged in the decree, and the pro *207 ceedings which led to it; is in the court of session in Scotland.
The bill must be dismissed with costs.(a)

 As to what is necessary in a plea denying the validity of a foreign judgment in personam, see the recent cases of Cowan v. Braidwood, 1 Mann. & Gr. 882 ; Ferguson v, Mahon, 11 Ad. & Ell. 179 ; Reynolds v. Fenton, 3 Mann. Gr. &. Scott, 187.

 The complainants appealed to the chancellor, and the decree was affirmed by the supreme court in equity, before Justices Jones, Hurlbut and Edmonds, Sept. 29th, 1849.
The following index to the contents of the case, as it may be convenient: appears in this volume.
Statement of the bill of complaint, page . 0 0 128
“ of will of Sir William Douglas, . 128
The multiple-poinding, . 132
The 1st summons, ..... . 132
“ Returns to ditto, .... e 138
“ Claim of George Douglas, . 139
“ his brother and sisters, . * • 141
“ Interlocutors of the Court of Session, . 0 142
Statement of the answer in this suit, 142
Complainants testimony, .... . 153
Do. H. D. Cruger, .... . 154
Do. Messrs. Anderson, Edinburgh, .... 157
Do. Account of Mr. Young, writer to the signet, against younger children of G. Douglas, deceased, .... 159
Do. Extracts from correspondence between Mrs. Douglas and Samuel Douglas, .... 162
Defendant’s testimony, viz.: Memorial submitted by trustees of Sir W. D. to counsel , in 1810, and their
response, ...... . 168
Extract from Mrs. Douglas’ letter, . e 169
Complainant’s opening argument, . . > e • 169
Defendant’s argument, .... , , 171
Complainant’s reply, ..... e e 175
Opinion of the Assistant Vice-Chancellor, . 178